IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| KEEP YELLOWSTONE NUCLEAR FREE, ENVIRONMENTAL DEFENSE INSTITUTE, MARY WOOLEN, JOHN PEAVEY, DEBRA STANSELL, | )<br>)<br>)<br>)<br>) | Case No. CV-07-36-E-BLW<br><br>**MEMORANDUM**<br>**DECISION** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES DEPARTMENT OF ENERGY, and SAMUEL W. BODMAN, SECRETARY, UNITED STATES DEPARTMENT OF ENERGY, | )<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it cross-motions for summary judgment.  The Court heard oral argument on the motions on October 11, 2007, and took them under advisement.  For the reasons expressed below, the Court will grant the DOE's motion and deny the plaintiffs' motion.

## FACTUAL BACKGROUND

The Advanced Test Reactor (ATR) is a nuclear test reactor located at the Idaho National Laboratory (INL).  It was designed in the 1950s and began

**Memorandum Decision – Page 1**

operation in 1967.  It is owned by the DOE and operated by DOE's contractor,

Batelle Energy Alliance (BEA).

The ATR is designed to deliver intense bursts of radiation to materials and

fuels to simulate years of irradiation in just weeks or months.  Both the Navy and

NASA use the ATR to test propulsion systems for, respectively, the nuclear fleet

and space travel.  The ATR is also the only reactor in the United States capable of

producing high quantities of certain medical isotopes. The INL intends to use the

ATR to generate materials and fuels for next-generation nuclear plant designs.

The DOE asserts now that the ATR was originally designed "to operate

indefinitely," *AR* at 011194.  A study completed in 1988 concluded that the ATR

could be "operated well into the 21st Century (2014)."  *AR* at p. 011497.  An

Environmental Impact Statement (EIS) completed in 2000 that evaluated new uses

for the ATR assumed that it would be operating at least until 2035.[1]  A team of

---

[1]  In the 1990s, the DOE proposed to enlarge the capabilities of the ATR to include (1) production of isotopes for medical and industrial uses; (2) production of plutonium-238 for use in NASA missions; and (3) various civilian applications.  To evaluate the environmental impacts of this increased capability, the DOE completed in 2000 a programmatic EIS, known in this litigation as the NI PEIS.  The NI PEIS evaluated the environmental impacts over the next 35 years.  *AR* at p. 005595.  It examined the waste to be generated, the potential dangers including radiation emissions, and the resulting environmental impacts.  *Id.*   After reviewing the NI PEIS, the DOE issued a Record of Decision (ROD) concluding that the environmental impacts would be small and that the increase in capability should go forward.  *AR* at p. 009755.  The Court is not holding here that the NI PEIS excuses the DOE from following NEPA now.  Instead, the Court cites to the NI PEIS simply as some evidence – not determinative by itself – of the life span of the ATR.

**Memorandum Decision – Page 2**

nuclear industry experts commissioned to study the ATR in 2003 assumed that it would be in operation until at least 2025.  *AR* at 026040.

These evaluations predicted that the ATR would continue to operate in future decades, but did not set any end-of-life date.  An estimated demise was discussed, however, in a report prepared in June of 2006, known as the Mission Need Report – Safety Posture Modernization.  It concludes that "[o]perationally, ATR can continue until approximately 2050 when predicted core vessel neutron embrittlement limitations are projected to be cost prohibitive to resolve."  *See Mission Need Report* at ¶ 1.5.2 at p. 3.  This seems to be consistent with the conclusion of DOE's contractor in a report filed in March of 2006 that "it is unlikely that at the time of the original design, the design lifetime was evaluated for [operation through 2040]."

While these evaluations lack precision, they all assume a long life for the ATR.  When they are read together, they predict that the ATR would operate well past 2014, to a least 2035, and perhaps to 2050.

These projections of long life were challenged in 2003.  In that year, the DOE's Office of Independent Oversight and Performance Assurance (OA Team) found weaknesses in the ATR's coolant system, and questioned the ATR's ability to withstand seismic events.

**Memorandum Decision – Page 3**

As a result, the ATR was shut down for several months while the DOE addressed these problems.  In late 2003, the DOE concluded that all the safety concerns of the OA Team had been fixed, and the ATR was restarted.

To determine the cause of these problems, the DOE commissioned a report from its contractor known as the Causal Analysis Report, issued on December 17, 2003.  It concluded that the design failures were due to "[t]he failure of the various contractor[s] and DOE managers to adequately consider both design and safety basis information over the years when making modifications and changes" to the ATR.  *See Casual Analysis Report* at p. 15.  It also concluded that there was a lack of necessary funding for (1) updating the ATR's Safety Analysis Report and (2) hiring sufficient engineers.  *Id*. at pp. 16-17.

The ATR Manager, Elizabeth Sellers, engaged a team of nuclear industry experts to perform its own independent assessment of the ATR.  More specifically, they evaluated whether DOE management set "proper initial conditions . . . for long-term ATR operations," and also whether contractor plans "related to plant aging and equipment degradation, equipment upgrades, and future staffing needs." *AR* at 026039.

This team – known as the Assessment Team – issued a report concluding that while existing staffing and conditions at ATR would support near-term safe

operations, a comprehensive long-term plan should be developed.  *AR* at 026038.

On that point, the report states that "[t]he comprehensive long-term operating plan

should be prepared, or the practical operating lifetime of ATR will be determined

by default (*e.g.* material condition failures, human performance issues)."  *Id.*

      Five months later, on July 12, 2004, ATR Manager Sellers, analyzing these

reports, concluded that the ATR was "at a crossroads."  *AR* at p. 031375.  She

interpreted the reports to conclude "that safe operations, beyond the short term of

3-5 years, will be compromised without a comprehensive long term operating plan

and the funding to address inadequacies in human capital and physical

infrastructure."  Accordingly, she stressed that "[w]e must complete rigorous long

range planning efforts and recapitalize the ATR to avoid premature shutdown of

the facility."  *AR* at 031375.  She concluded that recapitalization "to improve the

state of infrastructure that supports reactor operations *will extend the useful life of

the facility*."  *AR* at 031394 (emphasis added).

      The DOE responded with the aptly-named "ATR Life Extension Program

[LEP]."  *AR* at pp. 011334-011400.[2]  The LEP is "a major project to extend the life

of the ATR to the year 2040."  *AR* at p. 011566.  In explaining its goals, the LEP

observes that "[t]he next generation of nuclear power plants must show substantial

---

[2]  The LEP has since been updated several times, most recently in September of 2006.

improvements in the areas of economics, nuclear waste minimization, non-proliferation of nuclear materials and safety." *AR* at p. 011346.  In this new world, the LEP predicted, "the ATR will play a vital role as a test bed for these new nuclear technologies." *Id.*

To fulfill this goal, the LEP contains a number of assessment plans.  For example, (1) the "Material Condition Assessment" segment evaluates the physical condition of the ATR;  (2) the "Performance Monitoring" segment reviews organizational issues; (3) the "Design Basis Reconstitution" segment seeks to reestablish a baseline for safe operations; (4) the "Staffing" segment's goal is to improve staffing, which is "currently insufficient," *AR* at p. 011367; (5) the "Seismic Assessment" segment evaluates seismic risks; (6) the "Probabilistic Risk Assessment" assess risks generally; and (7) the "Strategic Issues" segment is a catch-all category containing a number of issues.  For example, it seeks to develop a plan to ensure the supply of critical materials that are difficult to obtain, such as beryllium.  Another goal was to identify radioactive wastes with "no path to disposal" and develop disposal plans.  *AR* at p. 011368.

The DOE also evaluated projects that would improve the physical safety of the ATR.  Those upgrades were described in a separate document, dated June 30, 2006, and labeled "Mission Need Document for the [ATR] [LEP] Safety Posture

Modernization."  The DOE separated out these safety upgrades from the LEP itself.  As the most recent iteration of the LEP acknowledges, "[w]hile the modernization planning is integrally linked to the ATR LEP, it is not part of the plan."  *AR* at p. 011566.

With regard to the safety upgrades, the Mission Need report states that "[r]ecommended modernizations to the ATR will make substantial improvements in the margin of safety through implementation of a yet to be designed emergency core cooling system and by improving control room habitability and improving overall response during loss of cooling . . . accidents and loss of flow . . . accidents."  *Id*. at p. 2.  The report assumes that the ATR will operate until about 2050, and concludes that this 40-year life span "makes it prudent to consider the investment required to upgrade the ATR safety systems . . . ."  *Id*. at p. 3.

## LITIGATION BACKGROUND

KYNF brought this action to enjoin operation of the ATR.  Injunctive relief is warranted, KYNF asserts, because the DOE failed to conduct the required NEPA analysis before deciding in the LEP to extend the life of the ATR.  KYNF and the DOE have filed cross-motions for summary judgment.  The Court heard oral argument on the motions and took them under advisement.  The Court's analysis of the motions follows its discussion of the standard of review.

**Memorandum Decision – Page 7**

## STANDARD OF REVIEW

### 1.    Summary Judgment Standard of Review

The filing of cross-motions for summary judgment – where both parties essentially assert that there are no issues of material fact – does not vitiate the court's responsibility to determine whether disputed issues of material fact are present.  *Fair Housing Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  A summary judgment cannot be granted if a genuine issue as to any material fact exists.  *Id.*

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

### 2.    NEPA & APA Standard of Review

**Memorandum Decision – Page 8**

An agency's decision not to prepare an EIS under NEPA is reviewed under the APA's arbitrary and capricious standard. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998). In determining whether the BLM's decision was arbitrary and capricious, the Court must ask whether the agency has taken a "hard look" at the environmental consequences of its proposed action. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir. 1998). Under this deferential standard, the Court will affirm an agency's decision that is "fully informed and well-considered." *Id.*

## ANALYSIS

### 1. <u>Standing</u>

KYNF must establish that it meets both the constitutional and prudential standing requirements. Article III standing requires that KYNF show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005). KYNF must also demonstrate that its interests fall within the "zone of interests" protected by NEPA to satisfy prudential standing. *Id.*

KYNF filed 6 declarations to establish standing: (1) Peavy, (2) Stansell, (3) Woollen, (4) Craighead, (5) Broscious, and (6) McCoy.  The Court has reviewed these declarations and finds that they fulfill each of the constitutional and prudential standing requirements.  The Court therefore rejects the DOE's argument that plaintiffs lack standing.

**2.**    **Final Agency Action**

The DOE argues that its decision to embark on the LEP is not a "final agency action" and hence this action is premature under the APA.  The Court disagrees. The DOE has decided, as discussed in more detail below, to embark on a project of improving safety and gathering information to avoid a premature shut down of the ATR within 3 to 5 years.  That decision – represented by the LEP as discussed below – is a final agency action appealable under the APA.

**3.**    **Cross-Motions for Summary Judgment**

The Court must first determine what it is reviewing.  The DOE argues that only the LEP is at issue, that it contains only information-gathering plans, and that the recapitalization program for safety upgrades is not part of the LEP under review.  The Court disagrees.  After a long line of critical reports – from the OA Team, the Assessment Team, and the site contractor – ATR Manager Elizabeth Sellers found that the ATR was "at a crossroads."  Inaction, she concluded, could

lead to a "premature shutdown" of the ATR within 3 to 5 years, *i.e.*, by around 2008.  She insisted that the cure was a long-range plan that involved not only information-gathering assessments but also recapitalization.

The DOE quickly adopted her recommendations, establishing plans to proceed both with the assessments and the recapitalization.  While the DOE separated out the assessments from the recapitalization on paper, the hard fact remains that they were recommended together as the integral means for avoiding the "premature shutdown" warned of by ATR Manager Sellers.  To pretend otherwise would be to elevate form over substance.  Consequently, the Court will evaluate them as a single decision, which the Court will refer to hereinafter as the LEP, for ease of reference.

So defined, the LEP is more than a mere information-gathering plan.  As defined above, it also represents a DOE decision to upgrade critical safety components, including the cooling system and the control room.  Indeed, the LEP's very name – "Life Extension Plan" – denotes a DOE decision to extend the life of the ATR.  While the DOE originally expected the ATR to continue operating past 2025 – to as late as 2050 – various evaluations raised the specter of a premature shutdown in the time period between 2007 and 2009.  The LEP was designed to avoid that premature shutdown, and extend the life of the ATR out to its originally-

expected shutdown around 2040 to 2050.

KYNF argues that the LEP required the DOE to prepare a NEPA analysis. NEPA requires all federal agencies to prepare an EIS for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  If an agency decides not to prepare an EIS on the ground that the project is not a "major Federal action," the reviewing court must determine whether the agency has reached a reasonable conclusion.  *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir. 1990).

The ATR was built before NEPA was passed, and so no EIS was required to be done at the time of its original construction.  *Id*.  For such facilities, the agency need not prepare an EIS to evaluate the environmental effects "of mere continued operation of [the] facility."  *Id*. at 235.  "However, if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS."  *Id*.

Under this authority, an EIS may be required where "a revision or expansion of the original facilities is contemplated."  *Id*; *Andrus v. Sierra Club*, 442 U.S. 347, 363 n. 21 (1979) (stating that "major Federal actions include the expansion or revision of ongoing programs").  Thus, when the DOE increased "dramatically"

the shipments of nuclear waste into the INL, an EIS was required.  *See Public Service Co. of Colorado v. Andrus*, 825 F.2d 1483 (D. Id. 1993).  Similarly, in the present case, when the DOE was considering expanding the ATR's operations, it prepared the 2000 PI NEIS, as discussed above.

An EIS may also be required if the original life-span of the project is expanded.  KYNF points out that an EIS is required of commercial entities seeking to enlarge the life-span of their nuclear reactors beyond the original safe-life term of the reactor.  *See* 50 C.F.R. § 50.51 (stating that "[e]ach license will be issued for a fixed period of time . . . but in no case to exceed 40 years from the date of issuance"); 10 C.F.R. § 51.20(b)(2) (requiring EIS for commercial reactor license renewal).  Operating a reactor beyond its originally-expected life-span raises a host of issues: (1) How will the additional years of waste be handled?; (2) Will the reactor's design accommodate unanticipated future uses?; (3) Are emergency safety systems outmoded?; etc.

Thus, KYNF is on solid ground when it demands that the DOE prepare an EIS before (1) expanding the operations of the ATR during its expected lifetime, or (2) extending the operations of the ATR beyond its expected lifetime.  However, neither situation applies here.  The LEP represents a DOE decision to avoid a premature shutdown of the ATR and continue operations in line with its originally-

**Memorandum Decision – Page 13**

expected life span.  In other words, the LEP neither expands the current operation nor extends the originally-expected life span.

KYNF cites no cases that holding that NEPA is triggered by repairs and upgrades needed to attain the full life expectancy of the ATR, especially in the absence of evidence that the upgrades themselves affect the environment.  Finding no genuine issues of material fact, the Court will grant the DOE's motion for summary judgment and deny the motion filed by KYNF.  The Court will prepare a separate Judgment as required by Rule 58(a)(1).

DATED:  **October 30, 2007**

Honorable B. Lynn Winmill
Chief U. S. District Judge